## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARILYN SWEENEY; JOHN C. TENNERY, ANNILAURIE CAMMACK, JOHN M. CAMMACK, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS RS NORTH AMERICA LLC;<br><br>*Defendants*. | Case No.  1:21-cv-297<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiffs Marilyn Sweeney, John C. Tennery, Annilaurie Cammack, and John M. Cammack (collectively, "Plaintiffs"), on behalf of themselves and the Class and Subclasses of all others similarly situated as defined below, for their Complaint against defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips NA, and Philips RS are "Philips" or the "Defendants"), allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## INTRODUCTION

1.     Plaintiffs bring this action on behalf of themselves and a proposed Class and Subclasses of purchasers of Philips Bi-Level Positive Airway Pressure ("BiPAP"), Continuous Positive Airway Pressure ("CPAP"), and mechanical ventilator devices, which contain polyester-based polyurethane ("PE-PUR") sound abatement foam ("PE-PUR Foam").

2.      On April 26, 2021, Philips disclosed it had determined that there were risks that the PE-PUR Foam used in certain devices manufactured by Philips may degrade under certain circumstances.  On June 14, 2021, Philips issued a recall (the "Recall") of devices containing PE-PUR Foam, noting that Philips had determined that the PE-PUR Foam was at risk for degradation into particles which may enter the device's pathway and be ingested or inhaled by users of devices which contain PE-PUR Foam, as well as off-gassing certain chemicals.  Philips recommended that patients using Philips BiPAP and CPAP devices immediately discontinue their use of their devices.

3.      On July 22, 2021, the United States Food and Drug Administration classified the recall of Philips devices containing PE-PUR Foam as a Class 1 recall, the most serious type of recall reserved for recalls of devices that may cause serious injuries or death.

4.      Plaintiffs all owned or leased Philips CPAP, BiPAP, or mechanical ventilator devices prior to June 14, 2021. Plaintiffs subsequently learned that their CPAP, BiPAP, or mechanical ventilator devices had been recalled by Philips due to the presence of a dangerous PE-PUR Foam that could cause them to suffer from adverse health effects, including, *inter alia*, cancer. Plaintiffs have been advised by Philips to discontinue use of their devices. Plaintiffs must now spend a substantial amount of time and/or incur substantial expenses to replace the device. Philips has refused thus far to provide refunds of their products.

5.      Plaintiffs seek to recover damages on behalf of themselves and the proposed Class and Subclasses based on, *inter alia*, Philips' negligence, breach of contract, breach of express warranty, breach of implied warranties, and breach of state consumer protection law in connection with its manufacture, marketing, and sales of devices containing PE-PUR Foam.

## PARTIES

6.      Plaintiff Marilyn Sweeney is a citizen of the Commonwealth of Pennsylvania.

7.      Plaintiff John C. Tennery is a citizen of the State of Alabama.

8.      Plaintiff Annilaurie Cammack is a citizen of the State of Alabama.

9.      John M. Cammack is a citizen of the State of Alabama.

10.     Defendant Koninklijke Philips N.V. ("Royal Philips") is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands.  Royal Philips is the parent company of Philips NA and Philips RS.

11.     Defendant Philips North America LLC is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141.  Philips North America is a wholly-owned subsidiary of Koninklijke Philips N.V.  Upon information and belief, Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS, in North America.

12.     Defendant Philips RS North America LLC ("Philips RS") is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15296.  Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[1]

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and members of the proposed Class and Subclasses are citizens of a state different from Defendants.

---

[1]      *Philips announces completion of tender offer to acquire Respironics*, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed June 17, 2021).

14.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965, because at least one of the named Plaintiffs resides in this District, because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place within this District.

15.     The Court has personal jurisdiction over the Defendants. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District.  The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Defendants Philips RS and Philips NA are controlled by their parent Royal Philips. Defendants' affiliations with this District are so continuous and systematic as to render them essentially at home in this District. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## **FACTUAL BACKGROUND**

### I.    **Continuous Positive Airway Pressure Therapy**

16.     Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea.  CPAP therapy typically involves the use of a nasal or facemask device, and a CPAP device helps individuals breathe by increasing the air pressure in an individual's throat.

17.    Sleep Apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

## II.    Bi-Level Positive Airway Pressure Therapy

18.    Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea.  Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP is distinguishable from CPAP therapy, however, because BiPAP devices deliver two alternating levels - inspiratory and expiratory - of pressurized air into a person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device.  The inspiratory positive airway pressure assists a person as a breath is taken in.  Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. BiPAP devices deliver one level of pressurize air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

5

### III.    <u>Mechanical Ventilation</u>

19.     Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own. A mechanical ventilator pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

### <u>SUBSTANTIVE ALLEGATIONS</u>

20.     Philips developed, marketed, and sold a lineup of CPAP and BiPAP respirator devices under its "Sleep & Respiratory Care" portfolio designed to assist individuals with a number of sleep, breathing, and respiratory conditions, including sleep apnea. Philips' CPAP and BiPAP respirator devices typically cost several hundred, if not thousands of dollars.  Philips has sold millions of these devices in the United States.

### IV.    <u>Philips Sleep & Respiratory Care Devices Were Endangering its Users</u>

21.     On April 26, 2021, as part of its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR "sound abatement" foam Philips used to minimize noise in several CPAP and BiPAP respirators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[2]

---

[2]     *First Quarter Results*, Philips (Apr. 26 2021),
https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed June 16, 2021).

22.    Over a month later, on June 14, 2021, Philips announced that it was recalling several models of BiPAP, CPAP, and mechanical ventilator devices "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[3] Specifically, Philips announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[4] In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[5]

23.    The list of the devices recalled by Philips (the "Recalled Devices") include:

| Philips CPAP and BiLevel PAP Devices Subject to Recall[6] | |
|---|---|
| **Device Name/Model** | **Type** |
| Philips E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| Philips DreamStation ST, AVAPS | Continuous Ventilator, Non-life Supporting |
| Philips SystemOne ASV4 | Continuous Ventilator, Non-life Supporting |
| Philips C Series ASV, S/T, AVAPS | Continuous Ventilator, Non-life Supporting |
| Philips OmniLab Advanced Plus, In-Lab Titration Device | Continuous Ventilator, Non-life Supporting |
| Philips SystemOne (Q Series) | Non-continuous Ventilator |

---

[3]    *Philips issues recall notification to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 16, 2021).

[4]    *Id.*

[5]    Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (accessed June 16, 2021).

[6]    *Medical Device recall notification (U.S. only) / field safety notice (International Markets)*, PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 16, 2021).

| Philips DreamStation, CPAP, Auto CPAP, BiPAP) | Non-continuous Ventilator |
| Philips DreamStation GO, CPAP, APAP | Non-continuous Ventilator |
| Philips Dorma 400, 500, CPAP | Non-continuous Ventilator |
| Philips REMStar SE Auto, CPAP | Non-continuous Ventilator |

| **Philips Mechanical Respirator Devices Subject to Recall[7]** | |
| **Philips Device Name/Model** | **Type** |
| --- | --- |
| Philips Trilogy 100 Ventilator | Continuous Ventilator |
| Philips Trilogy 200 Ventilator | Continuous Ventilator |
| Philips Garbin Plus, Aeris, LifeVent Ventilator | Continuous Ventilator |
| Philips A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto Ventilator | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | Continuous Ventilator, Non-life Supporting |

24.    According to Philips, the PE-PUR Foam used in Recalled Devices puts Recalled Device users at risk of suffering from the following:  "Irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects."[8]  Philips further noted that it had received specific complaints from Recalled Devices users as suffering from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."[9]

---

[7]    *Id.*

[8]    *Id.*

[9]    *Id.*

**V.     The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless**

25.     As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

26.     The information described above, including the now-known health risks, the recall, and the medical advice issued by Philips, have rendered the Recalled Device worthless to patients with sleep and respiratory conditions. Individuals not using life-supporting ventilators must discontinue their use of the Recalled Devices or face health risks as grave as cancer. If they choose to discontinue use, they must pay for another expensive device in order to receive effective treatment. Individuals using life-supporting ventilators must seek out an alternative before discontinuing their use of the Recalled Devices.

27.     Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

- "**For patients using BiLevel PAP and CPAP devices**: Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[10]

- "**For patients using life-sustaining mechanical ventilator devices: <u>DO NOT discontinue or alter prescribed therapy</u>, without consulting physicians to determine appropriate next steps.**"[11]

28.     As a result of the above, Plaintiffs and the Class will have to undertake considerable expense replacing the Recalled Devices.

---

[10]     *Id.* (emphasis in original).

[11]     *Id.* (emphasis in original).

## VI.  <u>Philips Unreasonably Delayed its Recall</u>

29.    Philips has not disclosed when it first received reports from users of its Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[12]  However, given the fact that all Philips Respironics devices manufactured from 2009 to present have been recalled, it is unlikely that Defendants only recently learned of these issues.

30.    Thus, as a result of user reports, Defendants were aware of the degradation of the PE-PUR sound abatement foam used in the Recalled Devices, yet continued to manufacture and sell the Recalled Devices with such awareness for a significant period of time.  During this period, Defendants unreasonably and unjustly profited from the manufacture and sale of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of developing adverse health effects, including cancer.

31.    In fact, it was only after the early April 2021 release of the Philips Respironics DreamStation 2, a breathing device which does not contain the dangerous PE-PUR Foam, that Philips publicly admitted the problems with the Recalled Devices in a regulatory filing. As detailed above, it was not for another seven weeks that Philips officially recalled the Recalled Devices.

## VII.  <u>Philips' Recall Provides Little-to-No Relief to Class Members</u>

32.    As part of its announcement of the recall on June 14, 2021, Philips announced that it would be implementing "a comprehensive repair and replacement program for the affected devices" as follows:

---

[12]    *Medical Device recall notification (U.S. only) / field safety notice (International Markets)*, PHILIPS RESPIRONICS https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 16, 2021).

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.[13]

33.     As the above language makes clear, Philips did not intend to replace the Recalled Devices with Philips' newly manufactured DreamStation 2 devices that contain a different foam and are therefore not affected by the recall (although individuals could always purchase a new Philips DreamStation 2 on their own), but instead intended to switch out the dangerous PE-PUR Foam in each Recalled Device. As events have already shown, this is a time-consuming process that has left, and will continue to leave Recalled Device users without use of their devices for untold periods of time.

34.     As implemented to date, the "repair and replacement" program has not repaired a single Recalled Device. Recalled Device users seeking to have their devices repaired or replaced are asked to register their devices on the Philips website, but are provided only with a registration number and no information as to when they can expect their Recalled Devices to be repaired. Upon information and belief, Philips has not provided ***any*** guidance to ***anyone*** as to when Recalled Devices will be repaired.

---

[13]     *Id.*

35.    It was not until September 1, 2021, over 2 ½ months after officially announcing the recall, that Philips announced it had begun to implement its repair and replacement program.[14] Philips has not provided guidance as to who will receive replacement devices or will have their devices repaired, only stating that some individuals will have their devices "rework[ed]" and that others will have their devices replaced.

## VIII.    Plaintiff Marilyn Sweeney

36.    Plaintiff Marilyn Sweeney is a citizen and resident of the Commonwealth of Pennsylvania.

37.    Ms. Sweeney acquired two Recalled Devices without notice or knowledge of the health risks associated with the use of Recalled Devices in January and February 2019.

38.    Ms. Sweeney regularly used her Recalled Devices to treat a medical condition until learning of Philips' recall of the Recalled Devices whereupon she then purchased a non-defective replacement device on July 13, 2021.

39.    As a result of the health risks associated with the use of Recalled Devices, Ms. Sweeney's Recalled Devices are now worthless.

40.    Ms. Sweeney therefore seeks a refund of her out-of-pocket expenses relating to the acquisition and use of a Recalled Device, a refund of her out-of-pocket expenses relating to the acquisition of a non-defective replacement device, and all other appropriate damages.

## IX.    Plaintiff John C. Tennery

41.    Plaintiff John C. Tennery is a citizen and resident of the State of Alabama.

---

[14]    *Philips starts repair and replacement program of first-generation DreamStation devices in the US in relation to earlier announced recall notification*, PHILIPS (Sept. 1, 2021), *available at* https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210901-philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-in-relation-to-earlier-announced-recall-notification.html.

42.    Mr. Tennery acquired a Recalled Device without notice or knowledge of the health risks associated with the use of Recalled Devices on March 18, 2021.

43.    Mr. Tennery regularly used a Recalled Device to treat a medical condition until learning of Philips' recall of the Recalled Devices.

44.    As a result of the health risks associated with the use of Recalled Devices, Mr. Tennery's Recalled Device is now worthless.

45.    Mr. Tennery therefore seeks a refund of his out-of-pocket expenses relating to the acquisition and use of a Recalled Device, a non-defective replacement device, and all other appropriate damages.

### X.    Plaintiff Annilaurie Cammack

46.    Annilaurie Cammack is a citizen and resident of the State of Alabama.

47.    Ms. Cammack acquired a Recalled Device without notice or knowledge of the health risks associated with the use of Recalled Devices on September 22, 2015.

48.    Ms. Cammack regularly used a Recalled Device to treat a medical condition until learning of Philips' recall of the Recalled Devices.

49.    As a result of the health risks associated with the use of Recalled Devices, Ms. Cammack's Recalled Device is now worthless.

50.    Ms. Cammack therefore seeks a refund of her out-of-pocket expenses relating to the acquisition and use of a Recalled Device, a non-defective replacement device, and all other appropriate damages.

### XI.    Plaintiff John M. Cammack

51.    Plaintiff John M. Cammack is a citizen and resident of the State of Alabama.

52.     Mr. Cammack acquired a Recalled Device without notice or knowledge of the health risks associated with the use of Recalled Devices on May 30, 2013.

53.     Mr. Cammack regularly used a Recalled Device to treat a medical condition until learning of Philips' recall of the Recalled Devices.

54.     As a result of the health risks associated with the use of Recalled Devices, Mr. Cammack's Recalled Device is now worthless.

55.     Mr. Cammack therefore seeks a refund of his out-of-pocket expenses relating to the acquisition and use of a Recalled Device, a non-defective replacement device, and all other appropriate damages.

## TOLLING AND ESTOPPEL

## I.     DISCOVERY RULE TOLLING

56.     Plaintiffs, the Class, and Subclasses had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

57.     Neither Plaintiffs nor any other members of the Class or Subclasses, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein.  Further, Plaintiffs and members of the Class and Subclasses did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

58.     For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs, the Class, and the Subclasses.

II.    **FRAUDULENT CONCEALMENT TOLLING**

59.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Class and Subclasses.

60.    Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiffs and members of the Classes and Subclasses. Plaintiffs and the members of the Class and Subclasses were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Classes or Subclasses should be tolled.

<u>**CLASS ACTION ALLEGATIONS**</u>

61.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

62.    Plaintiffs seek class certification on behalf of a Class defined as follows (the "Class"):

> **NATIONWIDE CLASS:** all persons in the United States who, from the beginning of any applicable limitations period through June 14, 2021, purchased or leased one of the Recalled Devices for household or business use, and not for resale (the "Class").

63.    Plaintiffs also seek certification on behalf of a Subclass defined as follows:

> **PENNSYLVANIA SUBCLASS**: all persons who were or are citizens of the Commonwealth of Pennsylvania who, from the beginning of any applicable limitations period through June 14, 2021, purchased or leased one of the Recalled Devices for household or business use, and not for resale (the "Pennsylvania Subclass").

64.    Plaintiffs also seek certification on behalf of a Subclass defined as follows:

> **ALABAMA SUBCLASS**: all persons who were or are citizens of the State of Alabama who, from the beginning of any applicable limitations period through June 14, 2021,

purchased or leased one of the Recalled Devices for household or business use, and not for resale (the "Alabama Subclass").

65.     Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclasses based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

66.     Excluded from the Class and Subclasses are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Classes or Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs  and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

67.     **Ascertainability**. The proposed Class and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a Class or Subclasses.  Further, the Classes and Subclasses can be readily identified through records maintained by Defendants.

68.     **Numerosity (Rule 23(a)(1))**. The Class and Subclasses are so numerous that joinder of individual members herein is impracticable.  The exact number of members of the Class and Subclasses, as herein identified and described, is not known, but sales figures indicate that millions of individuals have purchased the Philips Recalled Devices.

69.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

- whether Defendants owed a duty of care to Plaintiffs and the Class or Subclasses;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations in advertising, warranties, packaging, and/or labeling were false, deceptive, and misleading;

- whether those representations were likely to deceive a reasonable consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations were false, deceptive, and misleading;

- whether Defendants breached their express warranties;

- whether Defendants breached their implied warranties;

17

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions;

- whether Plaintiffs and the members of the Class and Subclasses are entitled to actual, statutory, and punitive damages; and

- whether Plaintiffs and members of the Class and Subclasses are entitled to declaratory and injunctive relief.

70. **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Class and Subclasses. Plaintiffs and members of the Class and Subclasses (as applicable) suffered injuries as a result of Philips' wrongful conduct that is uniform across the Class and Subclasses.

71. **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class and Subclasses, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclasses, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class and Subclasses.

72. **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclasses is impracticable. The prosecution of separate actions by individual members of the Class and Subclasses would impose

18

heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes and Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

73.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

74.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants  acted or refused to act on grounds generally applicable to the Classes and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.  Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**BREACH OF EXPRESS WARRANTY**
**On Behalf of the Nationwide Class or, alternatively, the Subclasses**

75.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

76.     Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiffs and the Class and Subclasses.

77.     Philips expressly warranted, advertised, and represented to Plaintiffs and the Class and Subclasses that the Recalled Devices were safe and appropriate for human use.

78.     Philips made these express warranties regarding the Recalled Devices quality and fitness for use in writing through its website, advertisements, and marketing materials and on the Recalled Devices' packaging and labels.  These express warranties became part of the basis of the bargain that Plaintiffs and the Class and Subclasses entered into upon purchasing the Recalled Devices.

79.     Philips' advertisements, warranties, and representations were made in connection with the sale of the Recalled Devices to Plaintiffs and the Class and Subclasses.  Plaintiffs and the Class and Subclasses relied on Philips' advertisements, warranties, and representations regarding the Recalled Devices in deciding whether to purchase Philips' products.

80.     Philips' Recalled Devices do not conform to Philips' advertisements, warranties and representations in that they are not safe, healthy, and appropriate for human use.

81.     Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use had dangerous effects and was unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips.  These associated health effects substantially impair the use, value, and safety of Recalled Devices.

82.     Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or on Philips' websites or other marketing materials did Philips warn Plaintiffs and members of the Class and

20

Subclasses that they were at risk of developing health problems as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

83.     Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Philips thus utterly failed to ensure that the material representations it was making to consumers were true.

84.     The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiffs and members of the Class and Subclasses. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiffs and members of the Class and Subclasses at the time of purchase of the Recalled Devices.

85.     As manufacturers, marketers, advertisers, distributors, and sellers of Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

86.     In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations to induce Plaintiffs and members of the Class and Subclasses to rely on such representations.

87.     Philips' affirmations of fact and promises were material, and Plaintiffs and members of the Class and Subclasses reasonably relied upon such representations in purchasing the Recalled Devices.

88.     All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiffs or members of the Class or Subclasses.

89.     Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice that the PE-PUR Foam in

the Recalled Devices was unsafe from user reports. Philips had ample opportunity either to stop

using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them

safe and healthy for use by Plaintiffs and members of the Class and Subclasses, but failed to do so

until now.

90.     As a direct and proximate result of Philips' breaches of express warranty, Plaintiffs

and members of the Class and Subclasses have been damaged because they did not receive the

products as specifically warranted by Philips.  Plaintiffs and members of the Class and Subclasses

did not receive the benefit of the bargain and suffered damages at the point of sale stemming from

their overpayment for the Recalled Devices.

91.     Plaintiffs and the Class and Subclasses seek actual damages, injunctive and

declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder

for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### On Behalf of the Nationwide Class or, alternatively, the Subclasses

92.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

93.     Philips are merchants engaging in the sale of goods to Plaintiffs and the Class and

Subclasses.

94.     There was a sale of goods from Philips to Plaintiffs and the Class and Subclasses.

95.     At all times mentioned herein, Philips manufactured or supplied Recalled Devices,

and prior to the time the Recalled Devices were purchased by Plaintiffs and the Class and

Subclasses, Philips impliedly warranted to them that the Recalled Devices were of merchantable

quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on

the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and

appropriate for human use.  Plaintiffs and the Class and Subclasses relied on Philips' promises and affirmations of fact when they purchased the Recalled Devices.

96.     Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary use, and did not conform to Philips' affirmations of fact and promises as use of the Recalled Devices was accompanied by the risk of adverse health effects that do not conform to the packaging.

97.     Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging.

98.     Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips.

99.     Privity exists because Philips impliedly warranted to Plaintiffs and the Class through the warranting, packaging, advertising, marketing, and labeling that Recalled Devices were natural, and suitable for use to treat health conditions by individuals, and made no mention of the attendant health risks associated with use of the Recalled Devices.

100.     As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and Subclasses have suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and that they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

101.     Plaintiffs and the Class and Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their implied warranties and resulting breach.

### THIRD CLAIM FOR RELIEF

**FRAUDULENT MISREPRESENTATION**
**On Behalf of the Nationwide Class or, alternatively, the Subclasses**

102.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

103.    Philips falsely represented to Plaintiffs and the Class and Subclasses that the Recalled Devices were safe for human use.

104.    Philips intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class and Subclasses to purchase Recalled Devices.

105.    Philips knew that its representations about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and were thus at risk of causing adverse health effects to users of the Recalled Devices which does not conform to the products' labels, packaging, advertising, and statements.  Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class and Subclasses.

106.    Plaintiffs and the Class and Subclasses did in fact rely on these misrepresentations and purchased Recalled Devices detriment.  Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiffs' and the Class' and Subclasses' reliance on Philips' misrepresentations was justifiable.

107.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and Subclasses have suffered actual damages in that they purchased Recalled Devices that were worth less than the price they paid and that they would not have purchased at all had they known of the health risks, including cancer, associated with the use of the Recalled Devices that do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

108.    Plaintiffs and the Class and Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### FOURTH CLAIM FOR RELIEF

**FRAUD BY OMISSION**
**On Behalf of Nationwide Class or, alternatively, the Subclasses**

109.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

110.    Philips concealed from and failed to disclose to Plaintiffs and the Class and Subclasses that use of Recalled Devices is accompanied by a risk of adverse health effects that does not conform to the products' labels, packaging, advertising, and statements.

111.    Philips was under a duty to disclose to Plaintiffs and the Class and Subclasses the true safety, quality, characteristics, fitness for use, and suitability of the Recalled Devices because: (1) Philips was in a superior position to know the true state of facts about its products; (2) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of Recalled Devices for use by individuals; and (3) Philips knew that Plaintiffs and the Class and Subclasses could not reasonably have been expected to learn or discover that Recalled Devices were misrepresented in the packaging, labels, advertising, and websites prior to purchasing Recalled Devices.

112.    The facts concealed or not disclosed by Philips to Plaintiffs and the Class and Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase Recalled Devices.

113.    Plaintiffs and the Class and Subclasses justifiably relied on the Philips' omissions to their detriment.  The detriment is evident from the true quality, characteristics, and risk

associated with the use of Recalled Devices, which is inferior when compared to how Recalled Devices are advertised and represented by Philips.

114.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and Subclasses have suffered actual damages in that they purchased Recalled Devices that were worth less than the price they paid and that they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

115.    Plaintiffs and the Class and Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FIFTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION
**On Behalf of the Nationwide Class or, alternatively, the Subclasses**

116.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

117.    Philips had a duty to Plaintiffs and the Class and Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of Recalled Devices.

118.    Philips breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

119.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not

as warranted and represented by Philips. Specifically, Philips knew or should have known that: (1) the use of Recalled Devices was accompanied by risk of adverse health effects do not conform to the packaging and labeling; (2) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (3) the Recalled Devices were otherwise not as warranted and represented by Philips.

120.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and Subclasses have suffered actual damages in that they purchased Recalled Devices that were worth less than the price they paid and that they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects that do not conform to the products' labels, packaging, advertising, and statements.

121.    Plaintiffs and the Class and Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

**MAGNUSION-MOSS FEDERAL WARRANTY ACT**
**15 U.S.C. § 2301, *et seq*., on Behalf of the Nationwide Class or, alternatively the Subclasses**

122.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

123.    The Magnuson-Moss Warranty Act creates a private right of action for any consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under the Act or under a written warranty, implied warranty, or service contract. 15 U.S.C. § 2310(d)(1).

124.    At all relevant times, Defendants were "supplier[s]" of the Recalled Devices within the meaning of 15 U.S.C. § 2301.

125.    At all relevant times, Defendants were "warrantor[s]" within the meaning of 15 U.S.C. § 2302(e).

126.    At all relevant times, the Recalled Devices constituted "consumer products" within the meaning of 15 U.S.C. § 2301.

127.    At all relevant times, Plaintiffs and members of the Class and Subclasses were "consumers" within the meaning of 15 U.S.C. § 2301.

128.    At all relevant times, Defendants were engaged in the sale of consumer products (the Recalled Devices), throughout the United States, including Massachusetts, for use by members of the general public, including Plaintiffs and the members of the Class and Subclasses with the intent that it be used as a breathing device by consumers.

129.    At all relevant times, Defendants manufactured the Recalled Devices and placed it in sealed packaging to be opened by the ultimate consumer and used by individuals to treat health conditions.

130.    In so doing, Defendants impliedly warranted that the Recalled Devices sold to Plaintiffs and the Class were fit for the ordinary purpose for which such goods are used, i.e., treating health conditions.

131.    When sold by Defendants, the package was expected to reach the ultimate consumer without substantial change in the condition in which it was sold, and it did, in fact, reach its ultimate consumer without substantial change.

132.    Plaintiffs used Defendants' Recalled Devices to treat a medical condition as intended by Defendants.

133.    The Recalled Devices sold by Defendant were not fit for human use at the time of sale due to the presence of toxic PE-PUR Foam.

134.    Defendants had actual knowledge of its breaches of warranty set forth above as they received numerous customer complaints relating to the PE-PUR Foam's degradation in the Recalled Devices.

135.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and the other members of the Class have suffered damages in the amount of the sales price of the Recalled Devices.

136.    As a result of Defendants' breach of warranty, Plaintiffs and Class members suffered actual damages in that (1) the actual value of the merchandise they received was less than the value of the merchandise they bargained for denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

137.    Plaintiffs have not provided Philips with pre-suit notice of the defects giving rise to these Plaintiffs' claims because, pursuant to 15 U.S.C. § 2310(e), Plaintiffs may provide notice on behalf of themselves, the Class, and Subclasses after class certification.

## SEVENTH CLAIM FOR RELIEF

**PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
On Behalf of the Pennsylvania Subclass**

138.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

139.    At all times mentioned herein, Philips engaged in "trade" or "commerce" in Pennsylvania, as defined by 73 Pa. Cons. Stat. Ann. § 201-2(3), in that they advertised, offered for sale, and sold goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited, offered for sale, and sold "services," "property," "article[s]," "commodit[ies]," or "thing[s] of value" in Pennsylvania.

140.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTCPL"), 73 Pa. Cons. Stat. Ann. § 201-3 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . are hereby declared unlawful."

141.    For the reasons discussed herein, Philips violated and continues to violate the UTCPL by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by UTCPL §§ 201-1, et seq. Philips' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

142.    Philips repeatedly advertised on the labels and packing for the Recalled Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Recalled Devices were safe and fit for human use. Philips failed to disclose the material information that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

143.    Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase and use the Recalled Devices without being aware that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use. As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiff Sweeney and the Subclass suffered damages by purchasing the Recalled Devices because they would not have purchased the Recalled Devices had they known the truth, and they received products that were worthless because they contain unsafe PE-PUR Foam which can cause a number of adverse health effects, including organ failure and cancer.

144.    Plaintiff Sweeney and the Subclass conferred substantial benefits on Philips through their purchase and use of Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

145.    Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiff Sweeney and the Subclass in the form of the loss or diminishment of value of the Recalled Devices that Plaintiff Sweeney and the Subclass purchased, which allowed Defendants to profit at the expense of Plaintiff Sweeney and the Subclass. The injuries Plaintiff Sweeney and the Subclass sustained were to legally protected interests. The gravity of the harm of Philips' actions is significant and there is no corresponding benefit to consumers of such conduct.

146.    Plaintiff Sweeney and the Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief as provided by 73 Pa. Cons. Stat. Ann. § 201-9.2 and applicable law.

## EIGHTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### On Behalf of the Nationwide Class or, alternatively, the Subclass

147.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

148.    Plaintiffs and the Class and Subclass conferred substantial benefits on Philips through their purchase and use of Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

149.    Philips either knew or should have known that the payments rendered by Plaintiffs and the Class and Subclass were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

150.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiffs and the Class and Subclass.

151.    Plaintiffs and the Class and Subclass are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Philips, plus interest thereon.

152.    Plaintiffs and the Class and Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Philips as to each and every count, including:

A.  An order certifying this action and the Class and Subclasses requested herein as a class action, designating Plaintiffs as the representatives of the Class and Subclasses, and appointing Plaintiffs' counsel as counsel to the Class and Subclasses;

B.  An order declaring that Defendants' actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; and/or (iv) fraud by omission; and that Philips is liable to Plaintiffs, members of the Class, and members of the Subclasses, as described herein, for damages arising therefrom;

C.  An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

D.  A judgment awarding Plaintiffs, members of the Class, and members of the Subclasses all appropriate damages, in an amount to be determined at trial;

E.  A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, restitution, disgorgement;

F.  A judgment awarding Plaintiffs, members of the Class, and members of the Subclasses prejudgment and post-judgment interest, as permitted by law;

G.  A judgment awarding Plaintiffs, members of the Class and Subclasses costs and fees, including attorneys' fees, as permitted by law; and

H.  Grant such other legal, equitable or further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED:          October 27, 2021                    Respectfully submitted,

*/s/ Edwin J. Kilpela, Jr.*
Gary F. Lynch
Edwin J. Kilpela, Jr.
Elizabeth Pollock-Avery
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
ekilpela@lcllp.com
elizabeth@lcllp.com

James J. Pizzirusso
**HAUSFELD LLP**
888 16th Street, N.W.
Suite 300
Washington, DC 20006
Telephone: (202) 540-7200
jpizzirusso@hausfeld.com

E. Kirk Wood
**WOOD LAW FIRM, LLC**
P. O. Box 382434
Birmingham, AL 35238-2434
Telephone: (205) 908-4906
kirk@woodlawifrmllc.com

*Attorneys for Plaintiffs*